PHILLIPS PETROLEUM COMPANY, Norway, American Petrofina Exploration Company of Norway, Norsk Agip A/S, Norsk Hydro A/S, Elk Norge A/S, Total Marine Norsk A/S, Aquitaine Norge, A.D., Eurafrep Norge A/S, Coparex Norge A/S, Cofranord A/S, American International Reinsurance Company and Walter Insurance Limited, Plaintiffs-Respondents and Cross-Appellants-Petitioners,

v.

BUCYRUS-ERIE COMPANY, Bucyrus Disc, Inc. and Richard L. Johnson Company, Inc., Defendants-Appellants and Cross-Respondents,

DeZEEUW TRADING COMPANY, LTD., a/k/a Trading Company, DeZeeuw, Ltd., Defendant. †

Supreme Court

*No. 84–152. Argued June 3, 1986.—Decided June 23, 1986.*

(Also reported in 388 N.W.2d 584.)

† Motion for reconsideration pending. This motion was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

22

For the petitioners there were briefs by *Kurt H. Frauen, David B. Bartel* and *Borgelt, Powell, Peterson & Frauen, S.C.,* Milwaukee, and *William G. Paul,* general counsel, *C.J. Roberts* associate general counsel, and *C.H. Purdy,* all of Bartlesville, Oklahoma, of counsel, for Phillips Petroleum Company, and oral argument by *Kurt H. Frauen.*

For the defendants-appellants and cross-respondents there was a brief by *Laurence C. Hammond, Jr., Mary Pat Ninneman* and *Quarles & Brady,* Milwaukee, and oral argument by *Ms. Ninneman.*

HEFFERNAN, CHIEF JUSTICE. This is a review of a decision of the court of appeals[1] which reversed a judgment of the circuit court for Milwaukee county, Michael D. Goulee, circuit judge, awarding Phillips Petroleum Company, Norway, in excess of $1,600,000 in a breach of contract and negligence action against Bucyrus-Erie Company. We reverse the decision of the court of appeals and reinstate the judgment of the circuit court.

Phillips is an oil company operating drilling platforms in the Norwegian sector of the North Sea. In the early 1970's Phillips invited several crane manufacturers, including Bucyrus-Erie, to submit proposals for the sale of cranes to be used on their off-shore drilling platforms. The invitations described the weather conditions and the stresses of wind and wave under which the cranes would be expected to perform. Bucyrus-Erie, in March and April of 1971, submitted proposals for the sale of certain cranes manufactured by it, including proposals for the fabrication of adapters to allow the placement of the cranes on the various oil rigs operated by Phillips. The proposals were "accepted" by Phillips' "Purchase Order." Bucyrus-Erie proceeded with manufacture and delivery. The cranes and adapters were installed on 13 drilling rigs in the North Sea in 1973. On February 28, 1974, while Phillips was using one of the cranes to unload supplies from a ship, the crane broke loose from the platform and fell into the sea. As a consequence of this incident, it was concluded that the steel in the adapters was too brittle for the in-

---

[1] *Phillips Petroleum Co., Norway, et al. v. Bucyrus-Erie Co., et al.*, 125 Wis. 2d 418, 373 N.W.2d 65 (Ct. App. 1985).

tended use. The use of the cranes was suspended by order of the Norwegian inspection service. Subsequently, the adapter rings were replaced and certification for use was reinstated. Phillips brought this action against Bucyrus-Erie, claiming that the seller had breached its contract by failing to supply adapter rings made from the type of steel specified.

The jury found that Bucyrus-Erie had "breach[ed] their contract that the pedestal adapter would be fabricated from steel as requested" by Phillips. It also found that such breach was a cause of the damage to the plaintiffs. The circuit judge sustained the jury's findings and their verdict for damages for replacement costs and consequential damages.[2]

In motions after verdict, the circuit court undertook an analysis of the transaction between Phillips and Bucyrus-Erie. It pointed out that the proposal of Bucyrus-Erie constituted an offer and the purchase order of Phillips which followed was an acceptance of that offer. It held that, under the facts, Phillips had created an express warranty for a specified quality of steel in conformity with sec. 402.313, Stats.[3] (Chapter

---

[2] Numerous special verdict questions were answered by the jury. We do not repeat them, because any objections of significance are focused upon the question of the breach of the contract in respect to the adapters.

[3] Sections 402.313(1)(a), (b), and (c) and (2) provide:

**"402.313 Express warranties by affirmation, promise, description, sample.** (1) Express warranties by the seller are created as follows:

402, Stats., is the Wisconsin enactment of the Uniform Commercial Code—Sales.)

The court elected to disregard the disclaimers of Bucyrus-Erie contained in its proposals, because the purchase order, Phillips' Acceptance, contained on its face the boldface, contrasting colors-over-stamp legend:

"THIS ORDER EXPRESSLY LIMITS ACCEPTANCE TO THE TERMS STATED HEREIN. PURCHASER OBJECTS TO ANY ADDITIONAL OR DIFFERENT TERMS OF THE SELLER."

Under the rationale adopted by the trial court, it first concluded that there was a contract, *i.e.,* the parties had a "deal" to buy and sell cranes and their adapters, the seller had stated certain disclaimers in its offer, and the purchase order of the buyer disavowed

" (a)  Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

" (b)  Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

" (c)  Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

" (2)  It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

being bound by any terms in the proposals that were not contained in the acceptance, the purchase order.

Thus, following the approach of White and Summers, *Uniform Commercial Code* (West hornbook series) and as indicated by sec. 402.316(1), Stats.,[4] the trial judge concluded that, where the contract documents contain conflicting warranty terms, none of them became a part of the contract and, instead, the implied warranties of the code are imported into the contract as "gap fillers."[5] This approach, as Judge

---

[4] Sections 402.316(1), Stats., provides:

" **402.316 Exclusion or modification of warranties.** (1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other, but subject to s. 402.202 on parol or extrinsic evidence, negation or limitation is inoperative to the extent that such construction is unreasonable."

[5] Section 402.207, Stats., provides:

" **402.207 Additional terms in acceptance or confirmation.** (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

" (2)   The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

" (a)   The offer expressly limits acceptance to the terms of the offer;

" (b)   They materially alter it; or

" (c)   Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

" (3)   Conduct by both parties which recognizes the existence

Goulee believed, was specifically approved by this court in *Air Products & Chemicals, Inc. v. Fairbanks Morse, Inc.,* 58 Wis. 2d 193, 206 N.W.2d 414 (1973).[6]

The principal provisions in the proposal of Bucyrus-Erie eliminated by the trial court were the warranties and disclaimers appearing in 3A:

"WARRANTY

"3A. Manufacturer warrants the machinery, and all spares, replacements, tools and auxiliary equipment, now or hereafter furnished by it therefor, to be built in a workmanlike manner of sound high-grade material, and, under normal use and proper attention to operate properly. Any claim made under this warranty must be presented in writing to Manufacturer at South Milwaukee, Wisconsin, within six months after shipment or, in the case of Transit Crane carrier units whether or not sold separately, or any parts thereof, within six months after shipment or 4,000 miles travel, whichever first occurs. Manufacturer is to have the option of replacing F.O.B. works any element proved to be defective or of remedying any proved defect, but Manufacturer's liability in any event shall not exceed the re-

of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chs. 401 to 409."

[6] Because we do not rest our ultimate conclusion on the rationale of the trial judge, we do not expressly sanction his application of *Air Products.*

28

placement value of the defective element F.O.B. works, and in the case of units or parts purchased by Manufacturer, Manufacturer's liability shall not exceed the settlement which Manufacturer is able to obtain from its supplier. Manufacturer is to have a reasonable length of time, after recognition of claim, in which to exercise its above option, and shall have the right to require the return of the alleged defective element, transportation charges prepaid, before recognizing any claim. No allowance will be made for repairs or alterations undertaken without Manufacturer's written consent. If parts other than of the original manufacturer are used in replacement without Manufacturer's written consent, or if the purchaser falls in arrears in making any payment, or if, without Manufacturer's written consent, the machinery is repaired or altered in such a way as in Manufacturer's judgment to reduce its stability or reliability, or if the machinery is subjected to misuse, negligence or accident, all warranties are thereby waived. The fore-going warranty is in lieu of all tort liability and all other warranties or representations or rights of rejection, express or implied, by law or by contract. More specifically, but without restriction thereto, there is no representation or express or implied warranty that the machinery complies with the highway or other laws of any state. No agent, distributor or other person is authorized to give any other warranty, nor to assume any other liability."

Thus, in Bucyrus-Erie's proposal, its obligation was merely to furnish machinery to be built in a workmanlike manner of high grade materials warranted to operate properly under "normal"[7] use.

It also sought to limit damages to the replacement of defective equipment F.O.B. sellers works at Erie, Pennsylvania.

In addition, it sought to absolve itself of all "tort liability," stating that the option of replacing defective parts was in lieu of any other liability or damages.

The trial court, as its primary rationale, thus eliminated all of the conflicting warranties and disclaimers of 3A of Bucyrus-Erie's proposal and relied entirely upon the "gap fillers" of the code, *i.e.,* the terms that are implied in any commercial contract when the parties have not effectively supplied their own acceptable terms.

It also justified its support of the verdict by various alternatives. It concluded that, even if the terms were not conflicting, the terms of 3A, *supra,* disclaiming or limiting responsibility, were ineffective because they were not "conspicuous," as required by sec. 402.316(2), Stats.[8] Also they were misleading because they appear

---

[7] The bid invitation made clear the fact that the conditions of use were not "normal" in the adverse environment of the North Sea.

[8] Sections 402.316 and 401.201(10), Stats., provide:

" **402.316 Exclusion or modification of warranties.** (1)   Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to s. 402.202 on parol or extrinsic evidence, negation or limita-

under the heading of "Warranty," while, in fact, they, in the main, are disclaimers of warranty and liability.

tion is inoperative to the extent that such construction is unreasonable.

" (2)    Subject to sub. (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof.'

" (3)    Notwithstanding sub. (2):

" (a)    Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

" (b)    When the buyer before entering into the contract has examined the goods or the sample or model as fully as the buyer desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to the buyer.

" (c)    There is no implied warranty that cattle, hogs, sheep or horses are free from sickness or disease at the time a sale is consummated if all state and federal regulations pertaining to animal health are complied with by the seller, unless the seller knows at the time a sale is consummated that the cattle, hogs, sheep or horses were sick or diseased; and

" (d)    An implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

" (4)    Remedies for breach of warranty can be limited in accordance with ss. 402.718 and 402.719 on liquidation or limitation of damages and on contractual modification of remedy."

" **401.201 General definitions.** Subject to additional definitions contained in chs. 402 to 409 which are applicable to specific chapters or parts thereof, and unless the context otherwise requires, in chs. 401 to 409:

" (10)    'Conspicuous': A term or clause is conspicuous when

31

Additionally, the court held that the limitation of liability to replacement of parts F.O.B. Erie, Pennsylvania, even were it "conspicuous," would be ineffective because it failed of its essential purpose (sec. 402.719(2), Stats.,[9] *i.e.,* replacement of parts at the manufacturer's plant would be grossly inadequate when, from the bid invitations, Bucyrus-Erie knew that any failure during the course of operations would entail a correction of the defects at the situs of their use—the North Sea.

it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. But in a telegram any stated term is 'conspicuous'. Whether a term or clause is 'conspicuous' or not is for decision by the court."

[9] Section 402.719(1), (2), and (3) provides:

"**402.719 Contractual modification or limitation of remedy.** (1) Subject to subs. (2) and (3) and to s. 402.718 on liquidation and limitation of damages:

" (a)   The agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

" (b)   Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

" (2)   Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in chs. 401 to 409.

" (3)   Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

■

In respect to the disclaimer of tort liability, Judge Goulee correctly pointed out that this court will, as a matter of public policy, not countenance such disclaimers in the absence of such specificity in respect to the tort disclaimed. The disclaimer must make it apparent that an express bargain was struck to forego the possibility of tort recovery in exchange for negotiated alternate economic advantages, *e.g.,* lower contract cost or express concessions on other terms. *See, Arnold v. Shawano County Agricultural Society,* 111 Wis. 2d 203, 330 N.W.2d 773 (1983).

■

On appeal, the court of appeals, in reversing, concluded that the trial court erred when it submitted fact-finding functions to the jury when it had not previously ruled on the effectiveness of all of the contract terms. We see no error in this respect. Rather, we see the question as one of trial convenience best left to the discretion of the trial judge. No error was committed in this respect; and, in any event, no prejudice to Bucyrus-Erie has been demonstrated.

The court of appeals significantly disagreed with the trial court when it held as a matter of law,[10] that, because the purchase order did not contain specifically stated different terms from those in the proposal, the purchase order was "silent." Thus, it took the position that, because it is undisputed that the parties had a

---

[10] It should be recognized that, because there was no conflict in the evidence of the proceedings, only questions of law were presented to the court of appeals or to this court.

33

"deal," the warranties and disclaimers of the seller, in respect to which the buyer was silent, control.

The court of appeals also disagreed with the trial court's alternative rationales for sustaining the verdict.

We affirm the judgment of the trial court. We do so on a rationale that differs from that used by the trial court, but which we believe to be fully consistent with the undisputed facts and in conformity with the common sense approach to commercial transactions utilized in the Uniform Commercial Code.

We conclude, whatever Byzantine complexities the original exchange of contract documents might pose, that a rather simple straight-forward modified contract arose during the course of negotiations that specifically detailed the obligations of the seller to conform to exact specifications set by the buyer.

The original proposal of Bucyrus-Erie acknowledged that approval drawings would be submitted in the event the parties initially struck a deal to buy and sell.

In compliance with this provision, Bucyrus-Erie submitted for Phillips Petroleum's approval drawings which specified that the adapters would be fabricated from SD 3111 steel. Phillips, after a consultation with its metallurgical advisers, notified Bucyrus-Erie that SD 3111 would not be satisfactory for the intended use in fabricating the crane adapters. During August 1971, Phillips informed Bucyrus-Erie that any one of three specifically described and identified qualities of steel would be necessary. Bucyrus-Erie then submitted approval drawing 867069K21, stating that, "All Material:

ASTM A 516 Grade 70 (SD 3120)." This was one of the
three grades of steel specified by Phillips for use in the
adapters. Phillips then issued change orders, which di-
rected Bucyrus-Erie to "change material in pedestal
adapter to ASTM 516 Grade 70 [type steel]." Phillips
at this juncture agreed to pay and did pay Bucyrus-Erie
approximately $800 per adapter for the use of the ex-
pressly specified steel. On September 27, 1971, the in-
ternational contracts supervisor of Bucyrus-Erie wrote
a confirmatory letter, stating:

> "We certify that the pedestal adapters we are
> supplying against your subject purchase orders will
> be in accordance with our drawings 867069K21 and
> 867070K21."
> At trial, a Bucyrus-Erie witness testified that
> "we certify" meant "we guarantee."

Thus, whatever the prior state of the contract may
have been in respect to warranting the fabrication
from a particular steel or a steel fit for the use in-
tended, the contract after September 27, 1971, con-
tained, as a modification of the original contract, an ex-
press warranty under the provisions of sec. 402.313(1),
Stats.[11]

---

[11] Section 402.313, Stats., provides:

" **402.313 Express warranties by affirmation, promise, descrip-
tion, sample.** (1) Express warranties by the seller are created as
follows:

" (a)    Any affirmation of fact or promise made by the seller
to the buyer which relates to the goods and becomes part of the
basis of the bargain creates an express warranty that the goods
shall conform to the affirmation or promise.

" (b)    Any description of the goods which is made part of the

That warranty was breached. The jury specifically found that the parties contracted that the adapters be fabricated from a particular type of steel and that Bucyrus-Erie breached that portion of the contract.

It should be noted, in fairness to Bucyrus-Erie, that the substitution of a steel that was less tough and unsuited for the purpose to which it was put was made by plant operators apparently without the knowledge and consent of the Bucyrus-Erie management. Neither Phillips nor Bucyrus-Erie knew that a nonspecified grade of steel was used until tests were made following the accident. The original breach is thus explainable, but why Bucyrus-Erie continues to rely upon the clearly superceded "substitution" provisions of its original proposal is not explainable.[12] That portion of the proposal provided:

> "The right is reserved to make changes in specifications or design which, in the opinion of the man-

---

basis of the bargain creates an express warranty that the goods shall conform to the description.

" (c)  Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

" (2)  It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or recommendation of the goods does not create a warranty."

[12] Under the trial court's analysis, this reservation of the right to substitute never became a part of the deal, because the purchaser refused to acquiesce in terms not contained in the purchase order.

ufacturer, are an improvement or are necessary be-
cause of the unavailability of materials."

Had there been evidence of intent to substitute the
cheaper steel for the specified steel, for which a pre-
mium price was paid by Phillips, instead of "one hand
not knowing what the other was doing," we would be
faced with a fact situation that could present an aurae
of fraud. Happily, that fact situation is not presented,
but what is presented is that a reservation of a right
to substitute—that was never negotiated and, under
the supportable reasoning of the trial court, never be-
came a part of the contract—was supplanted by an ex-
tensively negotiated provision, for which an additional
consideration was paid and which, in the preliminary
stages of those negotiations, limited substitutions to
one of three specified grades of steel and eventually
came down to a specific and separately negotiated
agreement which resulted in a certification that a par-
ticular type steel would be used. To assert at this junc-
ture that there was a right of substitution in the metal
to be used in the adapters simply fails to take into ac-
count the modification of the contract.[13]

Thus, we conclude—limiting our focus to the only
matter before us, the contract for the fabrication of the
adapter rings—that the contract, as modified, called

---

[13] The jury was given the opportunity to support the position
of Bucyrus-Erie, but it found, even giving effect to the substitution
clause, that the steel specified was not "unavailable." In view of the
express modification of the contract, this instruction which relied
upon a supplemental provision of the contract, should not have
been given. Bucyrus-Erie, however, was not prejudiced by the in-
struction.

for the seller's agreement expressly warranting the precise quality of the steel to be used. That deal was made. Bucyrus-Erie breached that express warranty.

The question that remains for our consideration is the measure of damages.

Although we do not disagree with the trial court's conclusion that a disclaimer of liability or a limitation on damages that is inappropriately masked under a heading captioned, "Warranty," is in itself a reason to disregard it, we look to the merits of the Phillips' argument that damages ought not be limited to replacement of the defective part F.O.B. Erie because, under sec. 402.719(2), Stats.:

> " (2)    Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in chs. 401 to 409."

Here, the Phillips' argument is that to replace the adapters at Erie—a site thousands of miles from where the replacement was needed—is simply an unrealistic remedy. The adapter ring only failed on one crane, but the domino effect of that failure was that none of the Bucyrus-Erie cranes purchased by Phillips could be used until they were repaired and certified. Thus, the damage was not limited to the replacement value of a single part even on the 13 cranes. The defect resulted in the total failure of Phillips' ability to use expensive and complex equipment for a protracted period of time. This was damage caused for the "want of a horseshoe nail."

The circumstances here, the possibility of a physical failure because of wind and wave stresses of the

North Sea, were those that should have been reasonably anticipated. Here the Bucyrus-Erie Company not only culpably, though perhaps inadvertently, used a type of steel that, in view of the express warranty agreed to by the seller and the buyer, was destined to fail with all the consequent, and to be anticipated, injury to the purchaser. The essential purpose of any damage award is to make the injured party whole. *McCormick on Damages*, sec. 137, p. 560 (West, 1935). The replacement or the supply of new conforming adapters at Erie, Pennsylvania, only minusculely compensated the purchaser. The circumstances here require that the compensation fulfill the essential purpose of all damage awards—to make the innocent party whole. It is understandable that the boilerplate limit on damages may be appropriate in most cases. In most cases, the timely supplying of the deficient part will make a party whole. Not so in this case. While both parties to this action are giants in their areas of enterprise, we do not feel that the Uniform Commercial Code makes giant corporations fair game for either intentional sharp practices or a skewed rule of law. Under our justice system, the persona of the corporation is entitled to be treated fairly in commercial transactions. While we see no wilfulness or any evidence of subjective sharp practices in the performance of the contract, it is apparent that the remedy offered by Bucyrus-Erie's contract (concealed or masked in the warranty section) provides damages that are, in the circumstances, unconscionably low. The damage clause is unreasonable. While the court of appeals relied upon *Murray v. Holiday Rambler, Inc.,* 83 Wis. 2d 406, 265 N.W.2d 513 (1978), for its adherence to the letter of the damage-

limitation clause, it is our conclusion that the philosophy of damage awards expressed by this court in *Holiday Rambler* leads to the opposite conclusion—a conclusion consistent with the underlying philosophy of the Uniform Commercial Code that there be at least a fair quantum of remedy for breach of obligations. *See,* official comment (1), sec. 2–719 U.C.C.

Accordingly, in accordance with the code, the damage remedy is not that purportedly provided in the documents, but "remedy may be had as provided in [the code]" (sec. 402.719(2), Stats.), as applied by the trial court.

We reverse the decision of the court of appeals, thus allowing the judgment of the circuit court for Milwaukee county to stand.

*By the Court.*—Decision reversed.