PER CURIAM.
¶1 Tankstar USA, Inc. ("Tankstar USA"), Bulk Logistics, Inc. ("Bulk"), Schwerman Trucking Company ("Schwerman"), North American Bulk Transport, Inc. ("North American"), and Rogers Cartage Company ("Rogers") (collectively, "Tankstar") appeal a summary judgment granted in favor of Navistar, Inc. ("Navistar") and Lakeside International Trucks, Inc. ("Lakeside"). The judgment was granted on Tankstar's breach of contract and fraudulent inducement claims relating to its purchase of seventy-nine ProStar semi-trailer trucks manufactured by Navistar and purchased from Lakeside.
¶2 Tankstar argues the circuit court erred in granting summary judgment on its fraudulent inducement claim against Lakeside on the basis that Tankstar lacks an available remedy for any alleged fraud. We agree with the circuit court that Tankstar's subsequent conduct in selling the trucks and instituting the present action for contract-based damages had the effect of affirming the contract, thereby precluding Tankstar from seeking restitutionary damages associated with a rescission of its contracts with Lakeside. Because Tankstar has no breach of contract claim against Lakeside, the circuit court properly dismissed Tankstar's fraudulent inducement claim.
¶3 Tankstar also argues the contractual "repair and replace" remedy Navistar offered in its various warranties failed of its essential purpose because several trucks required repeated engine repairs. As a result, Tankstar asserts it is entitled to the full panoply of remedies available under the Uniform Commercial Code ("U.C.C."), including consequential damages. We agree with the circuit court that Tankstar has failed to present evidence that would permit a reasonable factfinder to conclude that, as to the entire batch of trucks, the "repair and replace" remedy has categorically failed due to the alleged design defects. We also observe that aside from its categorical claim, Tankstar makes no effort to argue or demonstrate that any individual truck or trucks suffered from such frequent and repeated repairs that Tankstar was deprived of an effective contract remedy. We therefore conclude that Tankstar was limited to its contractual remedies against Navistar. We affirm the circuit court in all respects.
BACKGROUND
¶4 This lawsuit concerns a series of semi-trailer truck purchases made by Tankstar USA through its wholly owned subsidiary Bulk. As part of the settlement of a prior dispute, Bulk was obligated to purchase half of the new trucks for its fleet from Navistar and Lakeside. Navistar was the manufacturer and Lakeside was the retailer from which Bulk purchased the trucks. After the purchases, Bulk leased the trucks to its sister companies-Schwerman, North American, and Rogers-which were also wholly owned subsidiaries of Tankstar USA.
¶5 Bulk's first purchases under the settlement agreement occurred in 2009. Bulk bought twenty "ProStar" trucks, which were the first design iteration Navistar manufactured to comply with new air quality standards that would go into effect in 2010. The trucks were manufactured with Navistar's proprietary "MaxxForce" engine. According to the testimony of Tankstar USA's president, Jack Schwerman, the first twenty ProStar trucks were a "disaster" and experienced "breakdowns and excessive down time."
¶6 Nonetheless, Bulk purchased additional ProStar trucks between 2010 and 2012. In January 2010, Bulk accepted delivery of twenty model year 2010-2011 ProStar trucks. In the spring of 2011, Bulk purchased forty model year 2012 ProStar trucks. The high failure rates of the original twenty 2009 trucks led Navistar and Lakeside to make Tankstar a "very attractive offer" to replace them. In mid-2011, Bulk placed an order for an additional twenty model-year 2012 trucks to replace the 2009 trucks.
¶7 After experiencing similar breakdown issues with the 2010-2012 ProStar trucks, Tankstar filed the present action in November of 2015, advancing causes of action for breach of express and implied warranties, breach of contract, and multiple theories of fraud, including fraudulent inducement as a result of Lakeside's alleged misrepresentations regarding the improved quality of the model year 2012 trucks.[1] Tankstar, recognizing that the various purchase contracts contained exclusive or limited express warranty provisions, also asserted that such provisions were unconscionable and had failed of their essential purpose, thereby permitting Tankstar to "recover all actual and economic damages."
¶8 Navistar and Lakeside filed motions to dismiss Tankstar's tort claims against them as being barred by the economic loss doctrine.[2] Specifically, Navistar and Lakeside argued the alleged fraudulent statements pertained only to the parties' expectations regarding performance or the quality or character of the goods sold. Navistar and Lakeside also sought to dismiss or strike Tankstar's allegations regarding the "unconscionability" of the warranties or remedy limitations contained in the relevant contracts, asserting that such allegations were not a part of a valid claim or an actionable legal theory.
¶9 The circuit court granted the motions and dismissed Tankstar's tort claims as barred by the economic loss doctrine.[3] Tankstar was permitted to pursue a contract-based fraud in the inducement claim, under which it was limited to the remedies available under contract law. The parties stipulated that references to the unconscionability or other failings in the contracts' warranty and remedy provisions were not substantive claims, but rather potential defenses to any assertion by Navistar and Lakeside that Tankstar's remedies were limited under the relevant contracts.
¶10 Following the circuit court's ruling on the motion to dismiss, Navistar and Lakeside each moved for summary judgment on Tankstar's contract claims, including its claims for breach of contract and breach of warranty. The relevant contracts in this case fall into two categories: (1) the vehicle purchase contracts between Bulk and Lakeside; and (2) Navistar's manufacturer's warranties and its service agreements with Tankstar. Navistar and Lakeside argued that they were entitled to judgment as a matter of law under each category of the relevant contracts.
¶11 The three purchase contracts used different versions of the standard "Motor Vehicle Purchase Contract" forms issued by the Wisconsin Automobile & Truck Dealers Association. Each purchase contract stated that Bulk was purchasing the trucks from the dealership "AS IS" with no warranties (including implied warranties).[4] Moreover, each contract disclaimed any liability on Lakeside's part for "any consequential damages, damages to property, damages for loss of use, loss of time, loss of profits, or income, or any other incidental damages arising out of the sale or use of the purchased vehicle." (Capitalization omitted.) Similarly, each contract stated that Lakeside was not a party to any warranties offered by the manufacturer.
¶12 Based on the foregoing language, Lakeside argued that because it had not warranted that the trucks would be free from defects-and indeed had disclaimed any warranties (whether express or implied)-Tankstar's breach of contract and warranty claims failed as a matter of law.[5] Lakeside also argued that Tankstar's contract-based fraudulent inducement claim failed as a matter of law because Tankstar had no available remedy for the alleged fraud. Tankstar could not seek rescission because it no longer owned any of the trucks involved in the lawsuit, nor could it prove that Lakeside breached any contract so as to entitle it to contract damages.
¶13 Navistar also argued it was entitled to summary judgment based on the language contained in its manufacturer's warranties and other service contracts.[6] Each of the trucks came with what Navistar refers to as its "base warranty." The base warranty promised that Navistar would, at its option, "repair or replace any part of this vehicle which proves defective in material and/or workmanship in normal use and service" for a period of twelve months from delivery or for the first 100,000 miles, whichever expired first. The base warranties disclaimed all other warranties, including the implied warranties of merchantability and fitness for a particular purpose, and they also expressly excluded liability for incidental and consequential damages.[7]
¶14 Tankstar also purchased several "optional service contracts" from Navistar. Like the base warranties, the optional service contracts included a "repair and replace" promise, but they extended the warranty by up to 500,000 miles on each covered vehicle. Each of the optional service contracts contained the same disclaimer regarding all other warranties as was found in the base warranty. The optional service contracts also precluded Navistar's liability for incidental and consequential damages.
¶15 After Tankstar expressed dissatisfaction with the frequency of breakdowns and its limited coverage under the base warranties and optional service contracts, the parties negotiated a "custom service contract" that extended the manufacturer's warranty to 72 months or 700,000 miles from the delivery date for covered vehicles. The custom service contract contained similar "repair or replace" language to that in the base warranties and optional service contracts. Like the other warranties, the custom services contract omitted coverage for incidental or consequential costs the owner incurred as a result of a covered malfunction or failure.
¶16 It is undisputed that Navistar has never refused to perform any requested repairs to a vehicle covered by one of its manufacturer's warranties. By Navistar's calculation, it paid approximately $1.5 million in total warranty dollars, with each individual truck requiring a different amount of repairs.[8] The number of "down days" during Bulk's ownership of each truck varied, with some trucks experiencing very few repair events and others being "down" for multiple periods, with those periods totaling more than one year in some instances.[9] Nonetheless, Tankstar does not dispute that for each repair event, Navistar performed the requested repair and Tankstar accepted the truck and put it back in service. Navistar observed that Tankstar did not seek any damages for unperformed repairs or replacement parts, but rather it sought lost profits of approximately $1.78 million for the time the trucks were unavailable as well as damages of approximately $1.94 million for the alleged diminished resale value of the trucks.
¶17 In defending against Navistar's summary judgment motion, Tankstar conceded its claims were not based on any purported refusal by Navistar to perform repairs when requested. Rather, Tankstar asserted that while the trucks were put back into service after each repair, they still were "defective and cannot be fixed." Tankstar argued that, under these circumstances, the "repair and replace" warranties Navistar offered failed of their essential purpose, permitting Tankstar to recover consequential and other damages.
¶18 As factual support for its assertion that the trucks were defective, Tankstar cited Navistar's use of an "exhaust gas recirculation" ("EGR") strategy to comply with new 2010 emissions standards. As described by Tankstar, EGR involves recirculating exhaust back through the engine in an attempt to "burn off" excess nitrogen oxides. Tankstar argued that the EGR approach caused critical engine components to fail due to heat and clogging, and that Navistar knew of the potential for such failures prior to marketing the 2010 and later trucks. Moreover, Tankstar asserted that despite numerous attempts to correct the problems associated with EGR, Navistar had been unable to eliminate repair issues associated with that compliance strategy. Tankstar represented that nearly all of its ProStar trucks had at least one EGR "system failure," with forty trucks experiencing three or more failures.
¶19 The circuit court granted Navistar's and Lakeside's summary judgment motions and dismissed all of Tankstar's claims. On the breach of contract and warranty claims against Navistar, the court ruled that Tankstar had failed to present evidence from which a factfinder could conclude that the "repair and replace" warranties failed of their essential purpose. Tankstar therefore was not entitled to avoid the contractual limitation of its remedies, which provided only that Navistar would service and repair the trucks when necessary. With respect to the fraudulent inducement claim, the court concluded that Tankstar had affirmed the purchase contracts by subsequently disposing of the trucks (thereby precluding rescission), and Tankstar could not prove that there had been a breach of those contracts so as to permit it to recover damages. Tankstar appeals.
DISCUSSION
¶20 We review a grant of summary judgment de novo. Tews v. NHI, LLC , 2010 WI 137, ¶ 40, 330 Wis. 2d 389, 793 N.W.2d 860. The summary judgment methodology is well established. Id. , ¶ 41. We first examine the pleadings to determine whether claims have been stated. Id. If so, we examine the moving party's submissions to determine whether it has made a prima facie case for summary judgment. Id. If a prima facie case for summary judgment exists, we examine the opposing party's affidavits and other proof to determine whether summary judgment is appropriate. Id.
¶21 Summary judgment must be granted when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2) (2015-16).[10] "The purpose of the summary judgment procedure is to avoid trials when there is nothing to try." Tews , 330 Wis. 2d 389, ¶ 42. In reviewing the parties' submissions, we draw all reasonable inferences in the light most favorable to the nonmoving party. Pum v. Wisconsin Physicians Serv. Ins. Corp. , 2007 WI App 10, ¶ 6, 298 Wis. 2d 497, 727 N.W.2d 346 (2006). Whether an inference is reasonable and whether more than one inference may be drawn are questions of law. Id.
I. The circuit court properly dismissed Tankstar's fraudulent inducement claim against Lakeside for lack of an available remedy.
¶22 Tankstar contends the circuit court erroneously granted summary judgment to Lakeside on Tankstar's claim for fraudulent inducement pertaining to certain representations Lakeside made about the quality of the model year 2012 trucks. The court's decision was based upon its conclusion that even if Tankstar could prove that it was fraudulently induced to enter into the purchase contract, Tankstar had affirmed that contract and was therefore limited to damages for breach of contract. Because Tankstar admittedly had no valid claim for breach of contract against Lakeside, it could not prove such damages and therefore had no basis for a recovery.
¶23 Tankstar does not take issue with the circuit court's conclusion that the economic loss doctrine precluded a tort-based claim for fraud in the inducement. Instead, Tankstar argues the court was incorrect in its understanding of the nature of contract-based fraud remedies. Relying on Tietsworth v. Harley-Davidson, Inc. , 2004 WI 31, 270 Wis. 2d 146, 677 N.W.2d 233, Tankstar asserts our supreme court "intended for a defrauded party like Tankstar to have a remedy." In Tankstar's view, under Tietsworth , it is entitled to what it characterizes as restitutionary damages, even though it has sold all of the trucks at issue in this litigation. The damages Tankstar seeks include "the loss in value reflected in the prices for which [it] sold the trucks[,] ... as well as other expenses related to those sales" in an amount sufficient to restore it to the position it would have been in prior to entering into the purchase contract.
¶24 In Tietsworth , Harley-Davidson motorcycle owners filed a class action lawsuit seeking compensatory and punitive damages for an alleged engine defect. Id. , ¶ 1. In concluding that the plaintiffs were limited to their contract remedies by the economic loss doctrine, our supreme court observed that, in addition to warranty remedies for the alleged defect, "there are contract remedies at law and in equity to the extent that the plaintiffs were fraudulently induced to purchase their motorcycles." Id. , ¶ 36. "[A] party fraudulently induced to enter a contract may affirm the contract and seek damages for breach or pursue the equitable remedy of rescission and seek restitutionary damages, including sums necessary to restore the party fraudulently induced to his [or her] position prior to the making of the contract." Id.
¶25 Tankstar argues its selling the trucks is inconsequential, as the law mandates that restitutionary damages are available regardless of whether one affirms or disavows the contract. Rescission generally requires each party to return, or at least offer to return, the property that he or she has received, the idea being that a person "cannot keep the consideration received or retain to himself the advantages of a contract and at the same time repudiate it." Wilks v. McGovern-Place Oil Co. , 189 Wis. 420, 423, 207 N.W. 692 (1926). An exception exists in equity when it would be impossible or unreasonable to return the goods, see Hall v. Bank of Baldwin , 143 Wis. 303, 309-10, 127 N.W. 969 (1910), but Tankstar has not argued such an exception applies here.[11] Rather, Tankstar contends it can recover restitutionary damages even if it cannot rescind the contracts.
¶26 Tankstar's argument is contrary to the black-letter law regarding election of remedies. For a contract fraudulently induced, "[t]he aggrieved party has the election of either rescission or affirming the contract and seeking damages." First Nat'l Bank & Tr. Co. of Racine v. Notte , 97 Wis. 2d 207, 225, 293 N.W.2d 530 (1980). These are alternative remedies; the defrauded party must choose one or the other. Grube v. Daun , 213 Wis. 2d 533, 551, 570 N.W.2d 851 (1997) ; Eklund v. Koenig & Assocs., Inc. , 153 Wis. 2d 374, 381, 451 N.W.2d 150 (Ct. App. 1989) ("When a party discovers an alleged fraud by the seller, he may affirm the contract and sue for damages, or he may disaffirm and seek restitution."); see also AVL Powertrain Eng'g, Inc. v. Fairbanks Morse Engine , 178 F. Supp. 3d 765, 772 (W.D. Wis. 2016) (observing that a party to a contract who discovers an alleged fraud has "two choices"). An action at law for contract damages is inconsistent with a request for rescission. Eklund , 153 Wis. 2d at 381.
¶27 The damages Tankstar seeks are clearly not restitutionary in nature. They will not place Tankstar in the position it would have been but for the existence of the contract. Rather, the circuit court correctly recognized that Tankstar had affirmed the contract by seeking damages that assumed the vitality of the purchase contracts. Namely, Tankstar sought lost profits from the times when the trucks were being repaired and consequently were not producing income. It also sought damages for the diminished resale value of the trucks. Neither loss is compensable as a matter of restitutionary damages associated with the unwinding of the contract.
¶28 This distinction is critical because restitutionary damages go hand-in-hand with rescission. "Rescission is always coupled with restitution: the parties return the money, property or other benefits so as to restore each other to the position they were in prior to the transaction." Head & Seemann, Inc. v. Gregg , 104 Wis. 2d 156, 159, 311 N.W.2d 667 (Ct. App. 1981), aff'd and remanded , 107 Wis. 2d 126, 318 N.W.2d 381 (1982). In other words, if rescission is unavailable, so is restitution.
¶29 Here, based on Tankstar's disposal of the trucks and subsequent lawsuit seeking contract-based damages, Tankstar's remedy for the alleged fraudulent inducement is limited to what it could recover as damages for breach of contract. But Tankstar has conceded that it has no viable breach claims against Lakeside. Rather, the only breach of contract claims remaining in this litigation pertain to Navistar's manufacturer's warranties and service contracts. In sum, the circuit court properly dismissed Tankstar's fraudulent inducement claim against Lakeside because Tankstar's subsequent conduct in affirming the contracts precludes the damages it now seeks.
II. The circuit court properly dismissed Tankstar's contract and warranty claims against Navistar because Tankstar has failed to demonstrate that the "repair and replace" remedy failed of its essential purpose.
¶30 The U.C.C. permits a seller to disclaim or limit both express and implied warranties, as well as the remedies available for a breach of any warranty. See WIS. STAT. § 402.316. Relatedly, WIS. STAT. § 402.719 permits the parties to contractually modify or limit the remedies available under the U.C.C.[12] However, the full panoply of U.C.C. remedies is available "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose." Sec. 402.719(2).[13]
¶31 Tankstar first argues the circuit court erroneously interpreted WIS. STAT. § 402.719. In Tankstar's view, the court erred because it interpreted § 402.719 as holding that a limited "repair or replace" remedy could fail of its essential purpose only when it is coupled with a warranty that the goods sold would be "free from defects," no matter how frequently repairs or replacement are required. However, we do not perceive the court to have been "effectively adding language" to § 402.719, as Tankstar accuses it of doing. To the contrary, the court appears merely to have been applying the statutory language to circumstances, such as here, where the parties agreed that the manufacturer would repair or replace any defective vehicle parts, and the manufacturer did so. In any event, our review on appeal from summary judgment is de novo.
¶32 As the circuit court recognized, and as Tankstar essentially concedes, whether a remedy has failed of its essential purpose turns upon whether the circumstances are such that the buyer has been deprived of the substantial value of the bargain. See Murray v. Holiday Rambler, Inc. , 83 Wis. 2d 406, 419, 265 N.W.2d 513 (1978). In other words, a contract that purports to limit the remedies available for breach must nonetheless provide "a fair quantum of remedy." Waukesha Foundry, Inc. v. Industrial Eng'g, Inc. , 91 F.3d 1002, 1010 (7th Cir. 1996) (citing Phillips Petroleum Co. v. Bucyrus-Erie Co. , 131 Wis. 2d 21, 40, 388 N.W.2d 584 (1986) ). In turn, this principle requires the party claiming breach to demonstrate "harm that the contractual remedy was incapable of curing." Id. Although it is typically a question of fact whether a "repair and replace" remedy is inadequate, see Midwhey Powder Co. v. Clayton Indus. , 157 Wis. 2d 585, 593-94, 460 N.W.2d 426 (Ct. App. 1990), if the record evidence permits only one conclusion, that question of fact may be answered by the court as a matter of law, see Groom v. Professionals Ins. Co. , 179 Wis. 2d 241, 249, 507 N.W.2d 121 (Ct. App. 1993).
¶33 WISCONSIN STAT. § 402.719(2)"generally applies when the remedy is ineffectual or when the seller fails to live up to the remedy's provisions." Waukesha Foundry , 91 F.3d at 1010. The parties mostly agree that a "repair and replace" remedy can fail of its essential purpose in two ways. The most obvious way is if a seller flatly refuses to accept the good for repair or replacement during the warranty period, assuming any other conditions have been met. See Midwhey Powder , 157 Wis. 2d at 593. It is undisputed that never occurred here; Navistar accepted the trucks and performed repairs so as to make them immediately operable.
¶34 The parties also generally agree that a "repair and replace" remedy can fail of its essential purpose if repairs or replacement are so frequently required that the purchaser has been effectively deprived of the benefit of the bargain. See id. "The purpose of an exclusive remedy of repair or replacement, from the buyer's standpoint, is to give him goods which conform to the contract ...." Holiday Rambler , 83 Wis. 2d at 420. A buyer "is not bound to permit the seller to tinker with the article indefinitely in the hopes that it may ultimately be made to comply with the warranty." Id. In other words, the relevant "benefit of the bargain" is that the purchaser is able to use the goods, in a meaningful manner, following their repair or replacement.
¶35 The warranty at issue in Holiday Rambler was a "free from defect" warranty, under which the seller promised that the product was free from defects in material and workmanship at the time of its delivery. Id. at 417. Navistar made no such promise here. Nonetheless, the parties do not dispute that repeated necessary repairs, if required on a sufficiently frequent basis, can deprive the buyer of the substantial benefit of the bargain. Cf. id. at 420-21 (observing that, if major problems requiring repair continue, it becomes obvious that a "particular vehicle simply cannot be repaired or parts replaced so that the same is made free of defect"). Under these circumstances, the parties generally agree that a limited "repair and replace" remedy can fail of its essential purpose within the meaning of WIS. STAT. § 402.719(2).[14]
¶36 Contrary to Tankstar's assertions about the circuit court's errors of law, the court's conclusion was, in fact, that Tankstar had failed to show that its contract remedies were inadequate to accomplish repair of the trucks so as to make them substantially operable for contractually acceptable periods of time. The court observed that Navistar had performed all warranty repairs as requested, expending tens of thousands of dollars per vehicle in some instances to make them operable. More importantly, nearly all of the trucks at issue in this lawsuit accrued substantial mileage during the course of Bulk's ownership, including after Navistar made repairs. Twenty-seven of the trucks had between 200,000 and 300,000 miles; thirty-eight of the vehicles had between 300,000 and 400,000 miles; and twelve of the trucks had in excess of 400,000 miles. Tankstar does not dispute the number of miles the trucks operated, nor has our review of the appellate record revealed any serious dispute about the extent of the vehicles' use while in Tankstar's possession.
¶37 Rather, Tankstar argues the "repair or replace" remedy failed of its essential purpose in its totality, and as to every truck, because all of the trucks suffered from what Tankstar deems were "unrepairable" design defects. Namely, the trucks' EGR systems would invariably cause their engines to fail at some point , even after a particular truck was repaired. According to Tankstar, it is not enough for Navistar to repair a failed engine such that the truck can be placed back in service-even if the truck then remains in service for a considerable amount of time or miles. Rather, the mere fact a design defect remains that will (someday) require another repair is sufficient to deem the "repair or replace" remedy as having failed of its essential purpose. Under this view, then, Tankstar does not argue the remedy failed with respect to a truck here or a truck there; rather, its claim is categorical. To support this view, Tankstar observes that three-quarters of the trucks had at least two EGR repairs during the course of Bulk's ownership, with ten trucks requiring at least five repairs, and there has been no permanent "fix" to address the allegedly "excessive repair rates" experienced by Tankstar.
¶38 Tankstar's wholesale approach is both incorrect and insufficient to create a genuine issue of material fact as to whether the "repair and replace" remedies in the various warranties failed of their essential purpose as to any specific truck. To prevail on its claim for consequential and other damages (i.e., to avoid the exclusive and limited remedy contemplated by the manufacturer's warranties and service contracts), Tankstar must demonstrate that repairs have been so frequent and numerous that it has effectively been deprived of the beneficial use of the product it purchased. In light of the undisputed evidence that Tankstar received substantial usage of the trucks at issue, Tankstar cannot succeed in its categorical claim merely by pointing out that the design of the trucks caused some of the trucks to require repairs, including, in some cases, repeated repairs. Rather, Tankstar must show that one or more individual trucks failed and required repair at an unacceptably high rate, thus rendering them inoperable for such a significant period of time that the purpose of the transaction-i.e., the purchase of trucks that are used on the road-had been frustrated.
¶39 Tankstar offers nothing in this regard, other than its assertion that "many of the trucks achieved mileage significantly less than the company's normal expectations." However, Tankstar makes no effort to show that the usage of any particular truck due to repair was so incompatible with Tankstar's expectations that Tankstar was deprived of the benefit of the bargain. Although it is possible that some of the trucks, on an individual basis, experienced repair events that were so frequent or numerous that a reasonable factfinder could conclude Tankstar was deprived of the benefit of the bargain in purchasing those specific trucks, Tankstar does not break its claim down on a per-truck level.[15] We will not abandon our neutrality to develop a per-truck argument on Tankstar's behalf, see Industrial Risk Insurers v. American Eng'g Testing, Inc. , 2009 WI App 62, ¶ 25, 318 Wis. 2d 148, 769 N.W.2d 82, nor do we have a duty to scour the record to determine whether any individual truck necessitated such frequent repairs that Tankstar was effectively deprived of the benefit of the bargain as to that vehicle, see Roy v. St. Lukes Med. Ctr. , 2007 WI App 218, ¶ 10 n.1, 305 Wis. 2d 658, 741 N.W.2d 256.
¶40 At the risk of Tankstar misconstruing our opinion just as it did the circuit court's, we repeat that Tankstar did not bargain for, or receive, a warranty that the trucks would be defect-free at the time of purchase, and certainly not that the trucks were without any design defect. Even if Tankstar is correct that the trucks were poorly designed, it accepted this possibility by agreeing to a purchase contract that provided only a time-limited "repair and replace" remedy for any defects. Even if the alleged design flaw was "unfixable," as Tankstar asserts, if the flaw does not keep trucks from substantially operating-both before and after any particular problem arising from the flaw is repaired-there can be no breach of the essential purpose of a repair and replace warranty. Tankstar offers no legal authority for a contrary conclusion. The undisputed facts show that Navistar has, generally speaking, lived up to its promise. In all, Tankstar's categorical argument is insufficient to "demonstrate[ ] the impotence of the contractually established remedy." See Waukesha Foundry , 91 F.3d at 1010.
By the Court. -Judgment affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

The 2009 ProStar trucks Bulk initially purchased are not at issue in this lawsuit, which solely concerns the eighty ProStar trucks Bulk purchased between 2010 and 2012. In addition, Tankstar admitted that one of the eighty ProStar trucks was damaged by flooding and was not taken out of service due to repair issues.

The economic loss doctrine endeavors to preserve the distinction between contract and tort law by requiring the parties to a particular transaction to pursue only their contractual remedies when asserting a claim for economic losses. Kaloti Enters. v. Kellogg Sales Co. , 2005 WI 111, ¶ 28, 283 Wis. 2d 555, 699 N.W.2d 205. "Economic loss" in this context is defined as "damages resulting from inadequate value because the product is inferior and does not work for the general purposes for which it was manufactured and sold." Id. , ¶ 29 (citation omitted). The economic loss doctrine is based on the principle that contract law-in particular the law of warranty-is better suited than tort law to deal with purely economic losses in the commercial arena. Id. , ¶ 28.

The circuit court dismissed Tankstar's tort claims without prejudice, stating it would permit Tankstar to re-plead any tort claims for which it could demonstrate a good faith basis to assert a claim that was not barred by the economic loss doctrine (i.e., a claim regarding a representation that did not relate to the quality or character of the goods sold). However, Tankstar did not file an amended complaint, and its tort claims were therefore deemed dismissed with prejudice by operation of the court's order.

The purchase contract forms differed in the manner in which they advised the purchaser that the dealer was not providing a warranty. On the first form, a box was checked under "Dealer Warranty Information" that stated the trucks were being sold "AS IS-NO WARRANTY. DEALER DISCLAIMS ALL WARRANTIES INCLUDING IMPLIED WARRANTIES OF MERCHANTABILILTY AND FITNESS FOR A PARTICULAR PURPOSE." The second and third contract forms advised that, unless "Dealership" was checked under a "Limited Extended Warranty" heading, the vehicles were being sold "AS IS - NO WARRANTY. Dealer disclaims all warranties including implied warranties of merchantability and fitness for a particular purpose." The box next to "Dealership" was not checked on either form. Thus, as Lakeside observed in its summary judgment brief, "[t]he only notable difference between the versions of the forms [as relevant here] is that ... the earlier version includes a warranty disclaimer by checking a box, while the later two versions indicate a warranty disclaimer by the absence of a checked box."

At the summary judgment hearing, Tankstar conceded its breach of contract claims failed against Lakeside. However, Tankstar continued to assert its fraudulent inducement claims against Lakeside.

The first purchase contract form stated the vehicles included Navistar's "New Vehicle Manufacturer Warranty." Although the boxes next to "Original Manufacturer Warranty" were not checked on the second and third purchase forms, Navistar does not dispute that it had service obligations for the trucks covered by those agreements.

Similar to the Lakeside contracts, Navistar's base warranty stated Navistar would not cover "[l]oss of time or use of the vehicle, loss in profits, inconvenience, or other consequential or incidental damages or expenses."

The lowest dollar value of repairs required by one truck was $244.53, while other trucks required much more expensive repairs, in one instance up to $53,685.48.

Tankstar observed in its summary judgment brief that the trucks had "roughly a 4-year ... average life."

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The defrauding party must bear the loss in these instances. First Nat'l Bank & Tr. Co. of Racine v. Notte , 97 Wis. 2d 207, 226, 293 N.W.2d 530 (1980).

Before the circuit court, Navistar argued that the service contracts were obtained separately from the purchase of the trucks and therefore were not subject to the U.C.C. sales provisions because they were contracts for repair services and not part of a transaction for the sale of goods. Navistar does not resurrect this argument on appeal, and we need not consider it.

The U.C.C. contemplates a distinction between a disclaimed or limited warranty and a contractual provision limiting the remedies available for breach. See Uniform Commercial Code cmt. 2., Wis. Stat. Ann. § 402.316 (West 2003) ("If no warranty exists, there is of course no problem of limiting remedies for breach of warranty."); see also Murray v. Holiday Rambler, Inc. , 83 Wis. 2d 406, 414, 265 N.W.2d 513 (1978). The parties appear to assume the "repair and replace" language operates as a limitation of remedies so as to fall within the ambit of Wis. Stat. § 402.719. We will do the same and, therefore, will not further address the aforementioned distinction.

We agree in principle with Tankstar's assertion that it is a question of fact whether the circumstances are such that a "repair and replace" remedy is inadequate. See Midwhey Powder Co. v. Clayton Indus. , 157 Wis. 2d 585, 593-94, 460 N.W.2d 426 (Ct. App. 1990). However, if the record evidence permits only one conclusion, that question of fact may be answered by the court as a matter of law. See Groom v. Professionals Ins. Co. , 179 Wis. 2d 241, 249, 507 N.W.2d 121 (Ct. App. 1993). Indeed, the summary judgment mechanism exists to resolve such cases, avoiding the time and expense of a trial when there is nothing to try. Yahnke v. Carson , 2000 WI 74, ¶ 10, 236 Wis. 2d 257, 613 N.W.2d 102.

Tankstar places the blame for this failure on the circuit court, which it faults for "not ask[ing]" whether the "repair or replace" remedy failed of its essential purpose as to any particular truck. It was not the circuit court's burden to produce evidence or argument in support of Tankstar's claims. When confronted with Navistar's summary judgment motion showing a meritorious defense to Tankstar's categorical failure of remedy claim, it was Tankstar's burden to argue (with supporting evidence) that its claims should survive as to a particular vehicle or vehicles. See Preloznik v. City of Madison , 113 Wis. 2d 112, 116, 334 N.W.2d 580 (Ct. App. 1983).