**COURT OF APPEALS
DECISION
DATED AND FILED**

**July 30, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2428**

Cir. Ct. No. **2020CV145**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

BUDDY'S PLANT PLUS CORPORATION,

  PLAINTIFF-APPELLANT,

 V.

VIKING MASEK GLOBAL PACKAGING TECHNOLOGIES, LLC,

  DEFENDANT-THIRD-PARTY
  PLAINTIFF-RESPONDENT,

 V.

M&S AUTOMATED FEEDING SYSTEMS INC.,

  THIRD-PARTY DEFENDANT.

---

APPEAL from a judgment of the circuit court for Sheboygan County: GEORGE A. LIMBECK, Judge. *Affirmed*.

Before Neubauer, Grogan, and Lazar, JJ.

¶1     NEUBAUER, J. Viking Masek Global Packaging Technologies, LLC entered into a contract with Buddy's Plant Plus Corporation under which Viking agreed to manufacture a custom machine that Buddy's planned to use to prepare and package bedbug detection products for one of its customers. Despite considerable efforts by the parties, Viking ultimately failed to deliver the machine. Buddy's sued, and after a bench trial, the trial court concluded that Viking had breached the contract.[1]  But the court construed language in a warranty clause of the contract stating that Viking's "maximum liability hereunder is limited to the amount paid to [it]" as limiting Buddy's recoverable damages to the amounts it had paid Viking. The court denied Buddy's request for consequential damages.

¶2     Buddy's appeals from the judgment entered after the trial, contending that the trial court erred in limiting its recovery and that it was entitled to recover consequential damages under the Wisconsin Uniform Commercial Code (UCC or Code). Specifically, Buddy's argues that: (1) the warranty clause does not apply to Viking's failure to deliver the machine; (2) the limited remedy failed of its essential purpose and thus does not bar an award of consequential damages; and (3) the contractual language limiting Viking's liability is unconscionable. Buddy's also challenges the court's conclusion that it failed to prove its consequential damages to a reasonable certainty.

¶3     As explained below, we conclude that the warranty clause does apply to Viking's breach of contract. Furthermore, the limitation of liability language in the clause does not fail of its essential purpose and is not unconscionable. Because we conclude that the clause applies to Viking's breach

---

[1] Viking does not challenge the trial court's conclusion that it breached the contract.

and is enforceable, we need not reach the issue of whether Buddy's proved its damages to a reasonable certainty. We affirm.

## BACKGROUND

¶4     Buddy's blends, fills, and packages products for retail sale. Its largest client, Scotts MiracleGro, approached it about packaging a bedbug detection product. The product consists of a small plastic tube containing liquid lure. The tube is packaged into a foil stick pack that is then placed inside the product. A user activates the product by pushing a button on the plastic case which punctures a hole in the stick pack, allowing the odor from the liquid lure to spread into the area surrounding the product and draw bedbugs into it.

¶5     Buddy's owner, Edward Studer, testified about how Buddy's began manufacturing the products and eventually entered into the contract with Viking at issue here. According to Studer, after Scotts approached Buddy's about assembling and packaging the products, the two companies worked to design a machine that would place the liquid lure in the tubes and seal the tubes at both ends. Buddy's built multiple of these "lure machines," which drop the tubes into buckets after sealing them. The tubes would then be collected and vacuum tested to make sure they did not leak. After the testing was completed, a Buddy's employee would collect the tubes and take them to a second, "prototype" stick pack machine, where they would be fed into the machine "one by one" to be sealed in the foil stick pack. According to Studer, this "prototype … was sufficient for our initial start-up procedure, but we knew [it] was not a method that we could keep." It was labor intensive—requiring an employee to work "multiple shifts" each day feeding the tubes into the prototype machine—and created a "bottle neck" in the production process because the lure machines could make and

3

seal the tubes faster than they could be fed through the prototype. So, in 2016, Buddy's contacted several companies about manufacturing a stick pack machine that would wrap the tubes more quickly and require less labor to operate.

¶6 Viking was one of the companies that submitted a bid to manufacture a stick pack machine for Buddy's. Viking proposed to build a stick pack machine that would have ten vertical lanes into which the tubes would drop and be encased in the stick pack. Viking's bid included two additional components: a printer and an "Inline Track Feeder" system that would be manufactured by M&S Automated Feeding Systems Inc. As described by Viking's project manager at the time, the feeder system would include two bowls that would sit on top of the machine. The tubes would be dropped into the bowls, which would vibrate and cause the tubes to become "oriented with the long axis of the [tubes] in the direction of travel, end to end, single file in each of ten lanes," at which point a trigger mechanism would "drop a single tube from each of the 10 lanes into" the stick pack machine.

¶7 Viking's bid identified a total price of $259,450 for the stick pack machine, M&S feeder system, and printer. Studer signed the bid on June 2, 2017, and Buddy's issued a purchase order for the contract price.

¶8 Viking's bid, which became the parties' contract, required Buddy's to pay 50% of the total contract price upon signing the bid, an additional 45% when Viking sent a second invoice near the end of its work, and the remaining 5% upon delivery or within 30 days of shipment. The contract did not specify a date for delivery: under the heading "**DELIVERY**," the contract states, "Lead time is to be determined upon receipt of signed order." Moreover, the contract specifies that "with respect to the Delivery Date, time will not be deemed to be of the

essence." After Buddy's accepted Viking's bid, Viking provided a project timeline indicating a closeout date of October 18, 2017. Buddy's paid half of the purchase price, $129,725.00, in June 2017.

¶9 The contract also contained a set of terms and conditions set forth in 13 numbered paragraphs over 2 pages. The numbered paragraphs are separated by double spaces. The text within each numbered paragraph is single-spaced and small, but legible.

¶10 Paragraph 2(b), entitled "**Custom Equipment and Change Orders**," addresses the parties' obligations if the product ordered is custom or unique. It states in part:

> If the Equipment is unique in design or function according to Buyer's specifications …, failure of [Viking] to effect Delivery of the Equipment in good faith by the Delivery Date will not be a breach of the Contract by [Viking] and will not excuse [Buddy's] performance thereunder. Instead, [Buddy's] and [Viking] will cooperate as necessary to achieve [Viking]'s performance under the Contract.

¶11 Paragraph 6, which begins with the bolded word "**Warranty**," appears at the bottom of the first page and continues onto the second page. The paragraph begins by setting forth the "exclusive warranty" Viking provided under the contract: that the "Equipment" Viking will provide will, until the earlier of twelve months from delivery or 2,000 hours of operation, "be free upon Delivery from any defects in materials and workmanship" and will "not infringe upon or misappropriate the intellectual property rights of any third party, excluding any modification to the Equipment by or on behalf of Buyer." The warranty clause then states that, subject to the exclusive warranty, Viking "will repair or replace broken or defective Equipment." The clause then specifies three categories of defects and damages that are "exclude[d] from warranty coverage." The final four

sentences of the clause: (1) disclaim other warranties; (2) specify that Buddy's sole remedy against Viking is under the express warranty; and (3) limit Viking's liability under the warranty to amounts Viking receives under the contract. The paragraph reads in full as follows:

> 6) **Warranty**. As the exclusive warranty under this Contract, and conditioned upon [Viking]'s receipt of all payments in full due [Viking] under this Contract, [Viking] warrants until the earlier to occur of the expiration of 12 months from the Delivery Date or 2,000 hours of operation of the Equipment that the Equipment will: **(a)** be free upon Delivery from any defects in materials and workmanship; and **(b)** not infringe upon or misappropriate the intellectual property rights of any third party, excluding any modification to the Equipment by or on behalf of [Buddy's]; provided, however, that the Equipment has not been damaged as a result of the neglect by [Buddy's], or its use other than in the normal course, and has been maintained, operated and serviced by [Buddy's] in accordance with the Equipment's specifications. Subject to the foregoing, [Viking] will repair or replace broken or defective Equipment, except that [Viking]'s labor costs, and shipping and travel expenses to repair or replace broken or defective Equipment will be [Buddy's] responsibility, for which [Viking] may demand payment in advance in its sole discretion. This exclusive warranty extends to [Buddy's] alone and terminates automatically upon [Buddy's] transferring the Equipment to any third party. [Viking] specifically excludes from warranty coverage and accepts no responsibility for **(x)** defects in the Equipment covered by warranties from the original equipment manufacturer(s); **(y)** damage from ordinary wear and tear, or [Buddy's] neglect or lack of proper maintenance or care; and **(z)** damages for which [Buddy's] loss is insured. There is no other warranty, express or implied, including any warranty of merchantability, fitness for a particular purpose or otherwise. [Viking] is not liable for indirect, special, incidental or consequential damages, or loss of profits of any sort, whether based in contract or tort, resulting from the supply, failure to supply, or failure or malfunction of the Equipment. [Viking]'s maximum liability hereunder is limited to the amount paid to [Viking] hereunder. [Buddy's] sole remedy against [Viking] for the Contract and any damages arising out of it will be limited to the warranty set forth above.

¶12     As Viking began working to build the stick pack machine, Buddy's continued to use its prototype machine to encase the tubes in stick pack. According to Studer, at some point around the time the contract was signed, Scotts determined that its products needed more of the liquid lure in the tubes to work. To accommodate the additional liquid, Buddy's decided to increase the length of the tubes. It informed Viking of this change and sent it new sample tubes.

¶13     Viking and M&S had difficulties with the new tubes. As Mark Grinager, M&S's owner, described the issue at trial, the ends of the sealed tubes were not always uniform. On some tubes, "the pinch[point] was too close to one end of the tubes." As a result, the end of the tube would "basically [be] oval shaped" rather than cylindrical. This posed a problem for M&S because its feeder system design "accumulate[d] those [tubes] end to end." Thus, Grinager explained, "[i]f you have two oval shaped ends, they could pass each other up and jam in the tube. So we needed those cylindrical ends so they could be accumulated end to end."

¶14     According to Studer, in late 2017, Viking informed Buddy's that M&S was "ha[ving] problems with the samples" but that "we'll figure it out." In February 2018, Viking sent a second invoice for payment of 45% of the contract price, $116,752.50, which Buddy's paid. Work on the feeder system continued, and in December 2018, Viking prepared a change order for certain modifications. The change order indicated that the modifications would change the project schedule; it identified the "New Date" as "16wks ARO, complete at M&S," which Viking's project manager testified meant 16 weeks "[u]pon receipt of order" with finishing and testing to occur at M&S. The cost associated with the change order was $19,447.22; Buddy's agreed to cover half of the cost, which it paid to Viking in January 2019.

¶15     Even after the modifications, however, Viking was unable to get the M&S feeder system to work with its stick pack machine without human intervention. Video of a test conducted by Viking showed that the tubes would not consistently move through the feeder system into the stick pack machine. Finally, in late 2019 or early 2020, Studer spoke with Viking about the status of the project. In an email sent after the call, Viking acknowledged that M&S's feeder system would not work and that M&S was unwilling to "make any additional efforts toward a solution." Viking indicated that it remained willing to fulfill the contract by "redesign[ing] the [feeder] to work with [Buddy's] product." Studer rejected that option and demanded a refund. Viking refused because, as its chief operating officer testified,

> we weren't finished with the project yet. There's—there was a solution, and we were headed towards that solution. We already had a tremendous amount of cost into the project, and we do not allow for a cancellation. If at any point Viking felt they couldn't fulfill those obligations, there might be a forfeit, … we'd definitely consider a refund. But at that point, we had a solution in mind, it just took a little longer than expected due to the circumstances.

Buddy's commenced this lawsuit several months later, in April 2020. At that point, Viking stopped its work; it never delivered the machine to Buddy's.

¶16     Buddy's presented evidence at trial of the labor costs it incurred between October 2017 and February 2023 because Viking did not deliver the machine. Notwithstanding the contract language limiting Viking's liability, Buddy's argued that it was entitled to recover these costs as consequential damages under the UCC.

¶17     In its oral ruling, the trial court described the contract as "between two commercial entities who—both of whom are very successful businesses."

The court found that "this stick pack machine was a custom-made machine specifically for Buddy's," not "an off-the-shelf model." The court pointed to the contract itself as support for this finding, noting that it contained a representation that "[Buddy's] is purchasing specialized goods that have been manufactured in part specifically for [Buddy's]." The court also noted that the contract did not specify a date for delivery and stated that "time was not of the essence."

¶18 Turning to the manufacturing process, the trial court found that "the lures themselves just posed a lot of complexities in terms of their non-uniform shape, length, the deformities that occurred in the manufacturing process of making the lures." As a result, there was "just a lot of variability" in the lures that "made it additionally complex to design [the] feeder and stick pack machine." "[A]t some point," the court found, "Viking decide[d] that the M&S feeder is not going to work. And that, ultimately, is why the machine is never delivered to Buddy's[.]" The court then recounted the events of early 2020, finding that Viking informed Buddy's that it would design the feeder itself, Buddy's demanded the return of its money, and Viking refused to do so.

¶19 Based on its findings, the trial court concluded that Viking breached the contract by not delivering a working machine within a reasonable period of time and by refusing to refund the amounts Buddy's had paid. The court did not identify a specific date on which the nondelivery breach occurred because, in its view, "the time frames here are tough to track" and the concept of a "reasonable period of time … is really a fuzzy term." But it stated that Viking should have made the decision to design the feeder system itself "far, far sooner" than it did.

¶20 Turning to the issue of damages, the trial court concluded that the terms limiting Viking's liability were enforceable. The court returned to the

custom nature of the machine, which it deemed "highly relevant" in the context of the language limiting Viking's liability:

> [There is p]retty clear language among two commercial parties. And I think it's unambiguous. But I also think when read in the context of the entire contract pretty much established that if Viking undertook a custom machine and failed that its exposure was limited to the contract, amounts paid under the contract.
>
> … Viking took on this contractual responsibility and limited its liability so they would not be subject to thousands and thousands of dollars in consequential incidental and other damages. Perhaps not the best way for … Viking to have done it, but that's very clear in this contract. This is a custom-built machine. There was risk, and the parties allocated those risks.

¶21    The trial court returned to this point later in its ruling, concluding that the limitation on Viking's liability "makes sense" given the specialized nature of the machine:

> The fact that … there may be a failure to deliver, which is what occurred, is all envisioned by the parties in the contract, and the parties allocated those risks. On the one hand, Viking runs the risk that if it does not deliver, it has to give the money back, which it didn't do, by the way. And on the other hand, Buddy's came forward with a lure and entered into a contract … for a customized piece of equipment. If it was not delivered or could not work, which … at least arguably was the situation here, Buddy's was entitled to its money back and to not anything greater than the purchase price of the machine[.]

Based on its conclusion that the limitation of liability in the contract was valid and enforceable, the court limited Buddy's recovery to the amounts it had paid Viking. Though it concluded that Buddy's was not entitled to recover any consequential damages, the court also concluded that Buddy's had not proven damages beyond the amounts paid under the contract to a reasonable certainty. The court

subsequently entered judgment against Viking in the amount of $256,201.11 plus interest, taxable costs, and disbursements.

## DISCUSSION

### I. Standard of Review

¶22    In reviewing the trial court's decision, we do not disturb its factual findings unless they are clearly erroneous.  WIS. STAT. § 805.17(2) (2023-24);[2] ***Laughland v. Beckett***, 2015 WI App 70, ¶20, 365 Wis. 2d 148, 870 N.W.2d 466. Buddy's arguments on appeal require us to interpret contract language, construe and apply statutes, and determine whether contract language is enforceable.  We conduct those inquiries de novo.  *See **Midwest Neurosciences Assocs., LLC v. Great Lakes Neurosurgical Assocs., LLC***, 2018 WI 112, ¶38, 384 Wis. 2d 669, 920 N.W.2d 767 ("[I]ssues of contract interpretation are reviewed de novo."); ***Estate of Miller v. Storey***, 2017 WI 99, ¶25, 378 Wis. 2d 358, 903 N.W.2d 759 ("Interpretation of a statute is a question of law that we review de novo[.]"); ***Manitowoc Co. v. Lanning***, 2018 WI 6, ¶21, 379 Wis. 2d 189, 906 N.W.2d 130 (stating that "enforceability of … a written contract ordinarily present[s a] question[] of law that this court determines independently").

¶23    Before delving into the parties' arguments, we note that the public policy of Wisconsin favors the freedom of contract.  ***Midwest Neurosciences Assocs., LLC***, 384 Wis. 2d 669, ¶39.  "Freedom of contract is based on the idea that individuals should have the power to govern their own affairs without interference."  ***Solowicz v. Forward Geneva Nat'l, LLC***, 2010 WI 20, ¶34, 323

---

[2]  All references to the Wisconsin Statutes are to the 2023-24 version.

Wis. 2d 556, 780 N.W.2d 111. This protection from interference includes the ability of commercial parties to freely allocate economic risk by contract. *See Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶28, 283 Wis. 2d 555, 699 N.W.2d 205.

¶24 The parties do not dispute that their contract is governed by Article 2 of the Wisconsin Uniform Commercial Code, WIS. STAT. ch. 402. Article 2 specifies the following remedy for a buyer's failure to deliver:

> the measure of damages for nondelivery … by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in [WIS. STAT. §] 402.715, but less expenses saved in consequence of the seller's breach.

WIS. STAT. § 402.713(1). However, Article 2 allows buyers and sellers, subject to certain limits discussed below, to make other remedies available in their contract, including "limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts." WIS. STAT. § 402.719(1)(a). Where a contractually specified remedy "is expressly agreed to be exclusive, … it is the sole remedy." Sec. 402.719(1)(b). With this background in mind, we turn to the parties' arguments.

## II. Application of Warranty Clause to Viking's Breach

¶25 Buddy's first contends that the trial court erred in applying the warranty clause to Viking's failure to deliver the machine. Buddy's relies on the distinction drawn in the UCC and the contract between breaches of contract and breaches of warranty and the remedies available for each. For example, Buddy's notes that the UCC provides different remedies for nondelivery of goods and a breach of warranty. *See* WIS. STAT. § 402.713(1) (defining "the measure of

damages for nondelivery or repudiation by the seller"); WIS. STAT. § 402.714(2) (identifying "[t]he measure of damages for breach of warranty"). Buddy's also contends that the contract discusses Viking's obligation to deliver the machine and the limited warranty Viking provides about the machine in separate provisions. The warranty clause, Viking argues, "does not deal with the manufacture or delivery of the machine" but instead "solely with post-delivery performance of the machine." Thus, it argues, the warranty clause "pertains to Viking's liability for defects in delivered, non-conforming products, not for its breach of contract for failing to manufacture and deliver a product to Buddy's in the first instance."

¶26 To evaluate this argument, we must examine the language in the warranty clause. In doing so, our task is "to give effect to the parties' intent, as expressed in the contractual language." *Seitzinger v. Community Health Network*, 2004 WI 28, ¶22, 270 Wis. 2d 1, 676 N.W.2d 426. "In ascertaining the intent of the parties, contract terms should be given their plain or ordinary meaning." *Huml v. Vlazny*, 2006 WI 87, ¶52, 293 Wis. 2d 169, 716 N.W.2d 807.

¶27 Here, the language in the warranty clause undermines Buddy's contention that it does not apply to the breach that occurred here. For example, the clause states that Buddy's "sole remedy against [Viking] for the Contract and any damages arising out of it will be limited to the warranty set forth" in the clause. By its terms, this language applies the limited remedy broadly to "the Contract"—not just the express warranty—and to "*any* damages arising out of it." (Emphasis added.) This language would apply both to Viking's delivery of a defective or nonconforming machine and also to what occurred here—the failure to deliver a nondefective machine. Buddy's argument that the warranty clause only applies if the machine is delivered but defective or nonconforming cannot be reconciled with this broader language.

¶28 Additionally, the warranty clause states that Viking "is not liable for indirect, special, incidental or consequential damages, or loss of profits of any sort, … resulting from the supply, failure to supply, or failure or malfunction of the Equipment." Viking highlights the phrase "failure to supply" in this sentence as describing the breach here. Buddy's acknowledges this phrase but argues that Viking's breach was not a failure to "supply" but instead a failure of "delivery," which the contract defines to mean "the voluntary transfer of possession of the Equipment by [Viking] to [Buddy's], free on board (f.o.b.) origin, Oostburg, Wisconsin."

¶29 The word "supply" is not defined in the contract or ch. 402,[3] so we must give it its plain and ordinary meaning. *Huml*, 293 Wis. 2d 169, ¶52. To determine that meaning, we may consult definitions contained in a dictionary. *See Gorton v. Hostak, Henzl & Bichler, S.C.*, 217 Wis. 2d 493, 507, 577 N.W.2d 617 (1998). When used as a verb, Merriam-Webster defines "supply" to mean "to make available for use"; "to satisfy the needs or wishes of"; and "to provide for." *Supply*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/supply (last visited July 18, 2025). Another dictionary provides similar definitions: "to make (something) available to be used"; "to provide someone or something with (something that is needed or wanted)." *Supply*, THE BRITANNICA DICTIONARY,

---

[3] The first numbered paragraph in the terms and conditions section of the contract defines certain words used in the terms and conditions. That paragraph also states that if a term is not defined in the contract, it is "defined in the uniform commercial code of the State of Wisconsin, Chapters 401 to 411, Wisconsin Statutes." The Wisconsin UCC does not define the term "supply," though ch. 411 does define two related terms. *See* WIS. STAT. § 411.103(1)(x) (defining "Supplier" as "a person from whom a lessor buys or leases goods to be leased under a finance lease"); § 411.103(1)(y) (defining "Supply contract" as "a contract under which a lessor buys or leases goods to be leased").

https://www.britannica.com/dictionary/supply (last visited July 18, 2025). Applying these definitions here, a "failure to supply" under the warranty clause would occur if Viking did not "provide" or "make available" to Buddy's a nondefective version of the contracted-for machine.

¶30 This meaning of "supply" is consistent with how the word is used elsewhere in the contract. For example, the contract obligates Viking to "provide a service technician for Commissioning of the quoted equipment" but specifies that "[t]he customer is to *supply* such skilled and casual labor as may be required to complete the work." (Emphasis added.) Another provision in the contract requires Viking to "comply with the reasonable requests of [Buddy's]" if Buddy's attempts to secure a refund of taxes paid in connection with the purchase of the machine, "including by *supplying* copies of all relevant documentation." (Emphasis added.) In each of these instances, a party to the contract is obliged to "provide" or "make available" something. We strive to give a word that appears multiple times in a contract the same meaning absent an indication that the parties intended otherwise. *See* **Acuity v. Estate of Shimeta**, 2023 WI 28, ¶32 n.8, 406 Wis. 2d 730, 987 N.W.2d 689 ("[W]hen the same or similar language is used in a contract …, the language should be applied consistently."). Here, Buddy's points to nothing suggesting such a contrary intent.

¶31 Accordingly, a "failure to supply" under the warranty clause occurs if Viking fails to "provide" or "make available to" Buddy's the stick pack machine and components that are the subject of the contract. That describes the act determined by the trial court to have breached the contract—in its words, "Viking breached this contract" because it "did not provide a working machine to Buddy's within a reasonable period of time under the UCC."

¶32    Buddy's reliance on the different remedies provided in the UCC for nondelivery and breaches of warranty does not save its argument. Although the Code provides distinct remedies for these breaches, it also permits parties to contract for additional or entirely different remedies. *See* WIS. STAT. § 402.719(1)(a) (stating that an "agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter"). Moreover, the Code makes clear that if the parties agree that a different remedy "is expressly agreed to be exclusive, … it is the sole remedy." Sec. 402.719(1)(b). The parties took advantage of the flexibility afforded by the Code in their contract, in which they agreed to work together on a custom machine. They substituted a remedy that is available "for the Contract and any damages arising out of it" in place of the Code-provided remedies and specified that this remedy is Buddy's "sole remedy." Thus, the existence of distinct remedies in the UCC does not require us to preserve that distinction in our interpretation of the parties' contract. The warranty clause does not apply only in the event the machine is delivered defective. It also applies where, as here, Viking fails to provide a working machine at all.

## III. Failure of Essential Purpose

¶33    Buddy's next contends that the limited remedy in the warranty clause does not limit the damages it may recover because that remedy failed of its essential purpose. Under WIS. STAT. § 402.719(2), "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in chs. 401 to 411." Our supreme court has explained that § 402.719 "gives the parties substantial latitude to fashion their own remedies for breach of the contract." ***Murray v. Holiday Rambler, Inc.***, 83 Wis. 2d 406, 418, 265 N.W.2d 513 (1978); *see also* ***Southern Fin. Grp., LLC v. McFarland State Bank***,

763 F.3d 735, 741 (7th Cir. 2014) ("Wisconsin courts enforce agreements in which parties allocate risk in advance."). But a limited remedy agreed to by the parties will not be enforced under the UCC "where [it] would effectively deprive a party of reasonable protection against breach." *Murray*, 83 Wis. 2d at 418. The Code requires "that at least minimum adequate remedies be available" to provide "at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract." *Murray*, 83 Wis. 2d at 419 (quoting U.C.C. § 2-719, cmt. 1).

¶34　　Here, Buddy's argues that the limitation of Viking's liability in the clause to "the amount paid to [it] hereunder" failed of its essential purpose because Viking did not return the money Buddy's had paid to it within a reasonable time. *See **BAE Sys. Info. & Elecs. Sys. Integration, Inc. v. SpaceKey Components, Inc.***, 941 F. Supp. 2d 197, 206 (D.N.H. 2013) (stating that "[a] refund remedy fails of its essential purpose … if the seller … is 'unable or unwilling to provide a refund … within a reasonable time'" (third alteration in original; citation omitted)). In support, Buddy's relies on *Murray*, in which our supreme court concluded that a limited repair-or-replace remedy in a motorhome purchase contract failed of its essential purpose because the seller was unable to repair multiple problems with the motorhome and return a substantially defect-free product to the buyer within a reasonable time after the buyer first received the motorhome. *Murray*, 83 Wis. 2d at 425. Buddy's argues that if the eight-month period during which repairs were unsuccessfully attempted in *Murray* was deemed unreasonable, then the "two-plus years" that elapsed between October 2017, the time at which Viking first estimated the project would be completed, and early 2020, when Buddy's demanded that its money be returned, is similarly unreasonable.

¶35     We are not persuaded.  The UCC states that "a 'reasonable time' for taking any action … under the [Code] depends on the nature, purpose and circumstances of such action."  *Murray*, 83 Wis. 2d at 420 n.7; WIS. STAT. § 401.205(1).  Here, we are focused on the refund remedy, which involved a return of Buddy's money in the event Viking was unable to provide the stick pack machine.  The circumstances surrounding that remedy lead us to conclude that Buddy's did not withhold a refund for an unreasonable period of time.

¶36     Buddy's focus on the "two-plus years" between Viking's first estimated closeout date and Buddy's demand of a refund is misplaced.  In assessing whether a seller provides a remedy within a reasonable time, we focus on the period of time during which the seller attempts to provide the remedy.  *Murray* exemplifies this approach.  There, the buyers acquired the motorhome in January 1974 and "had problems with [it] from the day they took possession."  *Murray*, 83 Wis. 2d at 411-12.  Between January and July of that year, the buyers returned the motorhome to the dealer "nine or ten times" for repairs.  *Id.* at 412.  In August, the buyers declined to allow the manufacturer to attempt further repairs, revoked their acceptance, and demanded a refund.  *Id.* at 413.  Our supreme court concluded that the eight-month period between January and August was a reasonable time for the manufacturer and dealer to effectuate the remedy at issue—repair—and that they had failed to do so.  *Id.* at 424-25.

¶37     The present case, in contrast, involves a different remedy and materially distinguishable surrounding circumstances.  Whereas *Murray* involved the delivery of a product and subsequent unsuccessful efforts to repair it, Viking never provided the stick pack machine to Buddy's.  Moreover, as the trial court found, Buddy's did not demand a refund until the *end* of the "two-years plus" period.  Up to that point, Viking had been working to finish the stick pack

machine and to get M&S's feeder system to feed the tubes into the machine. Although there was evidence that Buddy's grew impatient over time as Viking tried to get the machine and feeder system working, all indications are that Buddy's would have been willing to accept the machine had Viking been able to deliver it.

¶38    In assessing whether Viking provided a refund within a reasonable time, we are not convinced that it is appropriate to consider the months preceding Buddy's demand for that remedy.  This is especially so given the nature of the remedy.  A refund of Buddy's payments to Viking would be permitted under the contract in the event that Viking was unable to provide the machine.  Up to the time Buddy's demanded a refund, however, Viking had been working, at first with M&S and then on its own, to get the feeder system and machine to feed and wrap tubes at the contractually agreed-upon rate.[4]  The machine was to be custom-built for Buddy's intended use, and the difficulties Viking and M&S experienced during the manufacturing process were due at least in part to the changing and non-uniform shape and size of the tubes that Buddy's provided.  In addition, because the machine was custom-built to Buddy's needs, the contract *required* Buddy's to "cooperate as necessary to achieve [Viking]'s performance" after Viking did not meet its initial delivery timeline.  It would be odd, given these circumstances, for us to conclude that the months Viking worked towards delivering the machine should also count in determining whether Viking unreasonably delayed providing a remedy intended to redress nondelivery.

---

[4] The contract specified a "[r]ate of feed" of "40+ [parts per minute], up to 10 lanes of discharge, for a total of 400 [parts per minute], minimum," though Studer testified that after Viking experienced issues feeding tubes into the machine, the parties agreed to a reduced rate of 200 tubes per minute.

¶39    Given the circumstances here, and the nature of the remedy at issue, we conclude that the period of time to assess with respect to the refund remedy began in early 2020, when Buddy's demanded it. At that time, Viking declined to provide a refund because it believed it could fulfill its contractual obligations by redesigning the feeder system. Buddy's commenced this lawsuit two months later, in April 2020. Viking filed a motion to dismiss the complaint, arguing among other things that it had not breached the contract and that Buddy's did not have a right to cancel the contract and receive a refund. Although its arguments did not prevail, Viking continued to contest that a breach had occurred at trial. While the issue of breach remained unresolved, Viking did not unreasonably delay in not refunding the amounts Buddy's had paid to it.

¶40    For these reasons, we conclude that the limitation of Viking's liability in the warranty clause to the amounts Buddy's paid to it did not fail of its essential purpose.

## IV. Unconscionability

¶41    Finally, Buddy's argues that it should be able to recover consequential damages because the limitation of Viking's liability in the contract is unconscionable. It relies on WIS. STAT. § 402.719(3), which allows parties to limit or exclude consequential damages "unless the limitation or exclusion is unconscionable." "To be declared invalid as unconscionable, a contract or contract provision must be determined to be both procedurally and substantively unconscionable." *Aul v. Golden Rule Ins. Co.*, 2007 WI App 165, ¶26, 304 Wis. 2d 227, 737 N.W.2d 24; *see also* *Wisconsin Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶¶29, 33, 290 Wis. 2d 514, 714 N.W.2d 155. The procedural aspect of unconscionability examines factors surrounding the contracting process to

determine whether one party faced "an absence of meaningful choice." ***Deminsky v. Arlington Plastics Mach.***, 2003 WI 15, ¶27, 259 Wis. 2d 587, 657 N.W.2d 411; *see also* ***Aul***, 304 Wis. 2d 227, ¶26 (listing factors). Substantive unconscionability, in contrast, examines "the reasonableness of the contract terms themselves, that is, whether they are commercially reasonable or unreasonably favor the more powerful party." ***Aul***, 304 Wis. 2d 227, ¶26.

¶42 "Unconscionability rarely exists in a commercial setting involving parties of equal bargaining power." ***Trinkle v. Schumacher Co.***, 100 Wis. 2d 13, 19-20, 301 N.W.2d 255 (Ct. App. 1980). "This is because there is little need for the court to protect the interests of savvy commercial parties in dealings with each other." ***Dry Dock, L.L.C. v. Godfrey Conveyor Co.***, 717 F. Supp. 2d 825, 834 (W.D. Wis. 2010). Here, Buddy's has not carried its heavy burden of convincing us that judicial alteration of the terms of the parties' bargain is necessary.

*A. Procedural Unconscionability*

¶43 The factors that are considered in assessing procedural unconscionability include the parties' "age, education, intelligence, business acumen and experience, [and] relative bargaining power," as well as "who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms would have been permitted by the drafting party, and whether there were alternative providers of the subject matter of the contract." ***Aul***, 304 Wis. 2d 227, ¶26.

¶44 Insofar as the trial record contained evidence bearing on these factors, they do not weigh in favor of a conclusion that the limitation of liability language is procedurally unconscionable. The trial court found that Viking and Buddy's are commercially successful businesses. Buddy's had prior experience

with machine fabrication, having previously worked with Scott's to design and build multiple lure machines. In addition, before Buddy's decided to hire Viking to build the machine, it solicited and received bids from several other companies. This suggests that Buddy's had options for its contract partner and was not compelled to deal with Viking on whatever terms it proposed. Buddy's does not argue that it was hurried into accepting Viking's bid or that it lacked a meaningful opportunity to review all of the bid's terms. Although Viking prepared the bid, which Buddy's apparently accepted without changing its terms, on balance the facts described above do not suggest that Buddy's lacked a "meaningful choice" in selecting the company that would build the stick pack machine. *See Deminsky*, 259 Wis. 2d 587, ¶27.

¶45     In its appellate briefs, Buddy's folds an additional factor into the analysis: the alleged inconspicuousness of the limitation of liability language within the warranty clause. WISCONSIN STAT. § 401.201(f) defines the word "conspicuous," with respect to a contract term, as being "written, displayed, or presented [so] that a reasonable person against which it is to operate ought to have noticed it." Buddy's contends that the language does not satisfy this definition because it is not "separated out in a noticeable way from any other part of the contract," is "presented in the same typeface as almost every other provision of the contract," and is not "bolded, underlined, capitalized" or written in a different font that would cause it to stand out.[5] Buddy's relies on two other authorities for the

---

[5] WISCONSIN STAT. § 401.201(2)(f) identifies the following examples of terms that are conspicuous:

> 1. A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size.

(continued)

22

proposition that the inconspicuousness of the language renders it unconscionable: WIS. STAT. § 402.316 and our supreme court's decision in ***Phillips Petroleum Co. v. Bucyrus-Erie Co.***, 131 Wis. 2d 21, 388 N.W.2d 584 (1986). Neither supports the conclusion that the contract is procedurally unconscionable.

¶46 WISCONSIN STAT. § 402.316 does not apply to any and all language that appears in a warranty clause or provide that any language in a contract that is not conspicuous is unenforceable. To the contrary, the statute applies more narrowly to language that purports to *exclude or modify implied warranties*. Section 402.316(2) states that "to exclude or modify the implied warranty of merchantability or any part of it the language … in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous." By its terms, therefore, the statute does *not* apply to the sentences in the clause that exclude liability for consequential and other damages and limit Viking's liability to the amounts paid to it.

¶47 As to ***Phillips***, that case is materially distinguishable on multiple grounds. Phillips engaged Bucyrus-Erie to supply cranes that Phillips intended to use on its offshore oil drilling platforms in the North Sea. ***Phillips***, 131 Wis. 2d at 24. After one of the cranes broke loose and fell into the sea, it was determined that adapters on the cranes had not been made with the type of steel that Phillips had requested. ***Id.*** As a result, all of the cranes Bucyrus-Erie had supplied were

---

2. Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

taken out of service until they could be fitted with new adapters and recertified for use. *Id.* at 25. After a jury determined that Bucyrus-Erie had breached the parties' contract, the trial court affirmed the jury's award of consequential damages, disregarding a lengthy warranty clause contained in Bucyrus-Erie's proposal that purported to disclaim warranties and limit its liability to replacement of the defective parts at its place of business. *Id.* at 26-29. The court disregarded the clause primarily because Phillips' purchase order contained language limiting its acceptance to the terms in the purchase order, but it also concluded as an alternative ground that language in the clause disclaiming warranties and limiting Bucyrus-Erie's liability was not conspicuous under WIS. STAT. § 402.316(2).

¶48 On appeal, our supreme court affirmed the judgment on different grounds from the trial court. With respect to Phillips' recoverable damages, the court began its discussion by stating that it did not disagree with the trial court "that a disclaimer of liability or a limitation on damages that is inappropriately masked under a heading captioned, 'Warranty,' is in itself a reason to disregard it." *Phillips*, 131 Wis. 2d at 38. But the court went on to consider Phillips' argument that the limited remedy in the warranty clause was not enforceable because it failed of its essential purpose. *Id.*; *see also* WIS. STAT. § 402.719(2). The court concluded that the limited remedy did so fail and thus was not enforceable because it "only minusculely compensated" Phillips given the losses that could reasonably be anticipated from the failure of the adapters and, therefore, was "unconscionably low." *Phillips*, 131 Wis. 2d at 38-39.

¶49 We are not at liberty to disregard the *Phillips* court's comment about an "inappropriately masked" limitation on liability even though it was not the reason the court ultimately declined to enforce the warranty clause. However, we do not believe that description accurately characterizes the contractual language at

issue here. Though the language limiting Viking's liability is located in the warranty clause, it is not "inappropriately masked" by the clause.

¶50 The reason is that the limited remedy in the warranty clause is tied to the express warranty set forth in the clause. The clause begins by setting forth the express warranty given by Viking. The next two sentences obligate Viking to "repair or replace broken or defective Equipment" and specify that the warranty extends only to Buddy's. The following sentence identifies three categories of defects and damages which are not covered by the express warranty. The clause then disclaims any other express or implied warranties and excludes liability for "indirect, special, incidental or consequential damages, or loss of profits … whether based in contract or tort, resulting from the supply, failure to supply, or failure or malfunction of the Equipment."

¶51 After specifying what warranties and liabilities are not included in the contract, the last two sentences of the clause address the warranty and liability that are included. Those sentences tie Viking's liability to the express warranty set forth at the start of the clause. They state that Buddy's remedy for any damages under the Contract is limited to the express warranty, which states that Viking's liability under that warranty is "limited to the amount paid to [Viking] hereunder." Because Viking's liability under the contract is limited to, and defined by, the express warranty set forth in the warranty clause, the provisions in the clause pertaining to Viking's liability are not "inappropriately masked" there. *See Phillips*, 131 Wis. 2d at 38.

¶52 *Phillips* also does not control the outcome here because of the unique circumstances out of which that case arose. While acknowledging that "the boilerplate limit on damages may be appropriate in most cases," the supreme

court determined that the unique facts of that case—in particular the location of the cranes in the North Sea and Bucyrus-Erie's ability to anticipate that adapters not manufactured in accordance with the express warranty would result in failure of the cranes—caused the limited remedy to violate "the underlying philosophy of the Uniform Commercial Code that there be at least a fair quantum of remedy for breach of obligations." *Id.* at 39-40.

¶53    Although the supreme court used the phrase "unconscionably low" to describe Phillips' remedy, it did so in explaining why the remedy failed of its essential purpose under WIS. STAT. § 402.719(2). *Phillips*, 131 Wis. 2d at 38-39. The court did not cite the separate subsection (3) in § 402.719 that addresses unconscionability as a ground for setting aside a contractual exclusion of consequential damages. Thus, we do not understand the *Phillips* court to have concluded that the contractual bar on consequential damages was unconscionable under § 402.719(3).

¶54    But even if *Phillips* could be read to state such a conclusion, the facts of the case differ materially from those here. The part replacement remedy, which "minusculely compensated the purchaser" in *Phillips*, denied Phillips any monetary compensation resulting from the failure of the adapter. *Phillips*, 131 Wis. 2d at 39. In contrast, the trial court here concluded that the warranty clause entitled Buddy's to damages equal to the amounts it paid to Viking. Though that remedy falls short of what Buddy's sought to recover, it is not "minuscule[] compensat[ion]" on par with the remedy in *Phillips*.

*B. Substantive Unconscionability*

¶55    In assessing substantive unconscionability, we focus on the terms of the contract. *Aul*, 304 Wis. 2d 227, ¶26. Initially, we note that provisions barring

recovery for consequential damages "are common in commercial transactions between business[persons] acting at presumed arm's length." *W.R. Weaver Co. v. Burroughs Corp.*, 580 S.W.2d 76, 82 (Tex. Ct. App. 1979). As the New Jersey Supreme Court explained, "the potential significance of liability for consequential damages in commercial transactions undoubtedly prompted the Code's drafters, consistent with the Code's endorsement of the principle of freedom of contract, to make express provision for the limitation or exclusion of such damages." *Kearney & Trecker Corp. v. Master Engraving Co.*, 527 A.2d 429, 433 (N.J. 1987). That such exclusions are specifically permitted by the Code strongly suggests they should not be lightly discarded as unreasonable. *See Lefebvre Intergraphics, Inc. v. Sanden Mach., Ltd.*, 946 F. Supp. 1358, 1372 (N.D. Ill. 1996). Similarly, while the Code "disfavors disclaimers that leave the victim of a breach of contract without any remedy," "[i]t does not disfavor 'limit[s on] … the measure of damages recoverable,'" including "limiting a buyer to recovery of the price." *Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 8 F.3d 607, 611 (7th Cir. 1993) (omission and second alteration in original).

¶56 Though the limitation of liability language in the warranty clause favors Viking, we cannot say that it is "*unreasonably* favorable." *See Aul*, 304 Wis. 2d 227, ¶25 (emphasis added). As the trial court noted, Viking agreed to design and build a custom machine for Buddy's that, as Buddy's acknowledged, Viking would not be able to resell to another buyer. In exchange for assuming this risk, and offering a lower price than the other bidders, Viking could reasonably seek to limit its liability if it breached the contract to the amount it had been paid. *See Kearney*, 527 A.2d at 433 ("For certain sellers, exposure to liability for consequential damages could drastically affect the conduct of their business, causing them to increase their prices or limit their markets."). On the other side,

Viking's bid was the lowest that Buddy's received; two others "were much, much, higher." Buddy's could reasonably decide to accept the low bid and assume the risk that Viking's liability would be limited in the event of a breach. The limited remedy is not substantively unconscionable.

## CONCLUSION

¶57    For the reasons explained above, we conclude that the damage limitation provisions contained within the warranty clause of the contract apply to Viking's failure to provide the stick pack machine. The limited remedy does not fail of its essential purpose and is not unconscionable. Therefore, the trial court did not err when it limited Buddy's recoverable damages to the amounts it had paid Viking and declined to award consequential damages.

*By the Court.*—Judgment affirmed.

Recommended    for    publication    in    the    official    reports

No.     2023AP2428(D)


¶58     GROGAN, J. (*dissenting*).  Despite acknowledging that "[w]e are not at liberty to disregard the ***Phillips*** court's comment about an 'inappropriately masked' limitation on liability" when such limitation appears in a warranty clause, the Majority ultimately does exactly that in its strained—and in my opinion failed—attempt to distinguish this case from ***Phillips Petroleum Co. v. Bucyrus-Erie Co.***, 131 Wis. 2d 21, 388 N.W.2d 584 (1986).  Majority, ¶¶48-54.  According to the Majority, "[t]he reason" it concludes we are not bound by ***Phillips*** "is that the limited remedy in the warranty clause is tied to the express warranty set forth in the clause."  Majority, ¶50.  I am unconvinced.

¶59     The limiting language appearing in the "Warranty" clause at issue here provides as follows:

> Seller is not liable for indirect, special, incidental or consequential damages, or loss of profits of any sort, whether based in contract or tort, resulting from the supply, *failure to supply*, or failure or malfunction of the Equipment.   Seller's maximum liability hereunder is limited to the amount paid to Seller hereunder.   Buyer's sole remedy against Seller for the Contract and any damages arising out of it will be limited to the warranty set forth above.

(Emphasis added.)   Because this language attempts to "warrant" a product that was never delivered ("failure to supply"), I would conclude that this is an attempt to "inappropriately mask[]" "a disclaimer of liability or limitation on damages … under a heading captioned, 'Warranty,' [which] is in itself a reason to disregard it[.]"  *See **Phillips***, 131 Wis. 2d at 38.  Moreover, WIS. STAT. § 401.201(2)(f) defines what it means to be "[c]onspicuous,"—for example, use of a different text

size, font, or color—none of which are present in the language at issue here. Rather, the text of the "Warranty" clause is uniform in size and "is single-spaced and small," Majority, ¶9, and the last line of the clause carries onto a new page. Put simply, there is nothing about this formatting that sets the limiting language apart so as to make it conspicuous, and I would therefore conclude we are bound by *Phillips*. For these reasons, I respectfully dissent.